TERRI F. LOVE, Judge.
11 This case arises from plaintiffs’ petition asserting breach of contract, detrimental reliance, interference with contractual relations, unfair trade practices and unjust enrichment against defendants. Plaintiffs appeal the trial court’s judgment granting defendants’ Summary Judgment.
FACTUAL BACKGROUND AND PROCEDURAL HISTORY
The Regional Transit Authority (“RTA”) owned the Arabella Street Car Facility and its rear parking lot, located at 5600 Magazine Street, on the -corners- of Magazine and Arabella Streets in New Orleans, Louisiana (“Bus Barn”). The RTA ceased all transit related activities in the Bus Barn and announced its intentions to sell or lease the Bus Barn. In 1999, the RTA issued its formal Request for Proposals in its attempt to develop the Bus Barn property. The original deadline for the submitted proposals was set for December of 1999.
Prior to the RTA’s formal request for proposals, plaintiffs Darryl Berger (“Mr.Berger”) and Roger Ogden (“Mr.Ogden”) formed Arabella Bus Barn, L.L.C. (hereinafter collectively referred to as “the Arabella Group”), for the purpose of acquiring and developing the Bus Barn property. The Arabella Group’s development project was premised upon its plan to include an upscale supermarket Land accordingly, the Arabella Group contacted Whole Foods Market, Inc. and/or Whole Foods Market Southwest, L.P. (hereinafter collectively referred to as “Whole Foods”) in May of 1997, in the hopes of securing them as an anchor tenant in the newly developed Bus Barn.
Following several discussions, on March 2, 1998, Jean-Claude Lurie, (“Mr.Lurie”), Executive Vice-President of Real Estate & Development for Whole Foods, sent a Letter of Intent to Mr. Ogden of the Arabella Group, expressing Whole Foods’ desire to lease a portion of the space in the Bus Barn to operate a Whole Foods Market Store; on March 9, 1998, Whole Foods sent a subsequent Letter of Intent to the Arabella Group and included an exclusivity provision binding both parties to exclusively work with one another to secure a Whole Foods Market Store in the Bus Barn location.
The letter provided that the exclusivity agreement was to remain in effect for a period of twelve (12) months from the date of March 9, 1999 and was to be automatically extended up to an additional twelve (12) months, to the date of March 9, 2000, provided that the public process to acquire the Bus Barn site was in progress.
In March of 2000, Whole Foods sent another letter to the Arabella Group, confirming its financial proposal and acknowledging that the Arabella Group’s submitted proposal, which was to be submitted on March 9, 2000 to the RTA, was premised on Whole Foods’ commitment that Whole Foods would be the anchor tenant in the Magazine Street Bus Barn development project. Whole Foods further stated that they looked forward to working hand-in-hand with the Arabella Group through the various public approval processes in an *677 effort to deliver the finest food store in New Orleans.
|sThe RTA set the final due date for all sealed bids to be submitted by March 9, 2000. Among the five developers that submitted proposals in response to the RTA’s request for proposals were the Sarpy Properties, L.L.C. (“Sarpy”) and the Ara-bella Group. The Arabella Group’s proposal identified Whole Foods as its proposed anchor tenant. The Sarpy Group’s original proposal did not incorporate a grocery store because it believed a high volume tenant should be avoided; however, the Sarpy Group’s proposal suggested the Bus Barn be developed into a high-end retail oriented complex with a smaller office space component. The Arabella Group was required to revalidate its proposal in April of 2000, making it effective through July of 2000. With Whole Foods as its anchor tenant, the Arabella Group reconfirmed its original proposal.
In June of 2000, after conducting a public bid, the RTA notified the Arabella Group that it would enter into negotiations with Arabella Station, L.L.C. (“Arabella Station”), an entity of the Sarpy Group, because the Sarpy Group received the highest rating on its submitted proposal, pursuant to the evaluation criteria contained in the request for proposals. However, the RTA also notified the Arabella Group that if the Sarpy Group’s proposal was deficient in any manner, or the negotiations were unsuccessful, the RTA would schedule a meeting with the Arabella Group, as they received the second best score. In July of 2000, the RTA’s Board of Commissioners authorized the Chairman of the Board to accept the proposal submitted by the Sarpy Group.
Subsequent to the Sarpy Group receiving notice that the RTA had accepted their proposal, the Sarpy Group contacted Whole Foods to discuss whether it was interested in leasing space in the Bus Barn development. However, at that time, the Whole Foods representative declined to enter into negotiations with the Sarpy 1¿Group, conveying that they were working with the Arabella Group on the Bus Barn development project.
On August 2, 2000, Whole Foods faxed a letter of thanks to Mr. Ogden for his ongoing- work and reiterated Whole Foods’ commitment to continue to work solely with the Arabella Group on the Bus Barn development.
Two months later, in September of 2000, the RTA executed a purchase agreement to sell the Bus Barn to the Sarpy Group. Approximately one month later, in October of 2000, Larry Leon, a broker for Whole Foods, contacted Neal C. Hixon, of the Sarpy Group, and expressed an interest in discussing the Bus Barn as a potential site for a Whole Foods Market store.
At Whole Foods, Mr. Lurie’s successor, Chris Pine (“Mr.Pine”) learned that the RTA signed its contract with the Sarpy Group, and that Wild Oats, one of Whole Foods’ competitors had begun negotiations with the Sarpy Group to lease the space at the Bus Barn. Once Whole Foods obtained this information, Whole Foods began discussing a lease of the Bus Barn with the Sarpy Group. In May of 2001, Whole Foods and the Sarpy Group entered into a lease for space at the Bus Barn property. However, the RTA did not sell or lease the property to the Sarpy Group until November of 2001, six months after the lease agreement had been perfected by Whole Foods.
The Arabella Group, filed suit against 1) Whole Foods and 2) Arabella Station; Specialty Realty Development, L.L.C, and Sarpy (collectively hereinafter referred to as “the Sarpy Group”), asserting breach of contract, detrimental reliance, interference *678 with contractual relations, unfair trade practices and unjust enrichment.
IsSpecifically, the Arabella Group filed suit against Whole Foods asserting breach of contract and against the Sarpy Group asserting tortious interference with the contract they held with Whole Food. Ara-bella Group further asserted that the Sar-py Group conducted unfair trade practices by incorporating the proposal submitted by the Arabella Group into the amended proposal submitted by the Sarpy Group subsequent to the submission of their original proposal of March of 2000.
Defendants filed motions for summary judgment and following a contradictory hearing on Whole Foods’, Arabella Station’s, and the Sarpy Group’s, motions for summary judgment, the trial court granted defendants’ motion for summary judgment. In its reasons for judgment, the trial court addressed whether there was a genuine factual dispute regarding the existence of an exclusive agreement between Whole Foods and the Arabella Group in October of 2000. The trial court found that there was no genuine issue of material fact and that the Whole Foods agreement to work exclusively with the Arabella Group was not in effect at the time W/hole Foods began negotiations with the Sarpy Group. The trial court further found that the agreement expired no later than September of 2000, when the RTA awarded the bid to the Sarpy Group, Accordingly, the trial court granted defendants’ motions for summary judgment. It is from this judgment that the Arabella Group appeals.
The Arabella Group avers that the trial court erred in holding that no genuine issue of material fact exist as to whether Whole Foods breached its exclusive contract with the Arabella Group; the trial court erred in failing to address the Ara-bella Group’s claims of detrimental reliance, unjust enrichment, tortious interference with contract, and unfair trade practice.
I „STANDARD OF REVIEW
The standard for reviewing the trial court’s grant or denial of a Motion for Summary Judgment requires de novo review. Smith v. Our Lady of the Lake Hospital, Inc., 93-2512, p. 26 (La.7/5/94), 639 So.2d 730, 750. Thus, appellate courts are to review summary judgments de novo utilizing the same criteria that govern the district court’s consideration of whether summary judgment is appropriate. Potter v. First Federal Savings and Loan Association of Scottlandville, 615 So.2d 318, 325 (La.1993). In Descant v. Herrera, 03-0953 (La.App. 4 Cir. 12/22/04) 890 So.2d 788, this court provided:
The Motion for Summary Judgment should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any show there is no genuine issue of material fact and that mover is entitled to judgment as a matter of law. La. C.C.P. art 966 B. The burden of proof remains with the movant; however, if the movant will not bear the burden of proof at trial on the matter that is before the court on the Motion for Summary Judgment, the movant’s burden on the motion requires him only to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claims, action or defense. Davis v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 97-0382, p. 7 (La.App. 4 Cir. 3/18/98), 709 So.2d 1030, 1033. There is no genuine issue of material fact when the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. *679 Id., at p. 7, 709 So.2d at 1033; La. C.C.P. art. 966 C(2).
Accordingly, the appellate court, like the trial court, should uphold a summary judgment decision only when “ ‘the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that mover is entitled to judgment as a matter of law.’ ” Braodscape.com v. Walker, 03-0904 (La.App. 4 Cir. 2/25/04), 866 So.2d 1085, citing La. C.C.P. art: 966(B).
Appellants assert that their contract with Whole Foods was extended by subsequent oral agreements between Mr. Ogden and Mr. Lurie between March of 1998 and August of 2000.
The March 2, 2000 letter expressly provides that Whole Foods’ commitment to the Arabella Group was predicated on the Arabella Group’s successfully obtaining control of the site and developing the property. However, Lee Valkenaar, Regional President of Whole Foods, faxed a letter of thanks to Mr. Ogden on August 2, 2000, for his ongoing work and confirmed Whole Foods’ commitment to continue to work solely with the Arabella Group on the Bus Barn development.
Whole Foods asserts that the letter written August 2, 2000 was written at the request of the Arabella Group, for the sole purpose of assisting them in persuading the RTA that the Arabella Group’s proposal remained the most viable and of imploring the RTA to reconsider its selection of the Sarpy Group. Whole Foods further asserts that when Mr. Valkenaar wrote the letter, he did not know about the March 2, 1998 agreement with the Arabella Group. Conversely, Mr. Valkenaar’s letter specifically stated that the purpose of the August letter sent to the Arabella Group was to “reiterate” Whole Foods’ intention to work solely with the Arabella Group in the Bus Barn development.
In is uncontroverted that in October of 2000, Mr. Pine of Whole Foods contacted Mr. Ogden to inform him that Wild Oats, a competitor of Whole Foods, had begun negotiations with the Sarpy Group for the Bus Barn project. However, the Arabella Group asserts that Mr. Pine implored Mr. Ogden to release Whole RFoods from the exclusive arrangement so Whole Foods could negotiate its own deal with the Sarpy Group. Plaintiffs further aver that, acknowledging the extensive undertakings and their exclusive arrangement, Mr. Pine proposed that Whole Foods would consider a release fee for expenses incurred by the Arabella Group, in the approximate amount of $200,000, and an agreement to work on future Whole Foods deals with the Arabella Group. Plaintiffs assert that Whole Foods remained bound by the exclusivity agreement with the Arabella Group until an agreement had been reached as to the release price as well as other terms. The Arabella Group further avers that Mr. Ogden’s conversation with Mr. Pine in October of 2000 evidences that there was an agreement to extend the term of the contract between the Arabella Group and Whole Foods.
Conversely, Whole Foods avers that upon notice to Mr. Ogden that they were entering into negotiations with the Sarpy Group for a lease at the Bus Barn development, Mr. Ogden threatened a lawsuit if Whole Foods proceeded, unless Whole Foods paid a fee. of approximately $200,000. Whole Foods further avers that Mr. Pine told Mr. Ogden that Mr. Ogden would have to discuss any legal obligations that Whole. Foods may owe the Arabella Group with Mr. Valkenaar or Jim Sud. Whole Foods contends that there were no further discussions, conversations, or meetings between plaintiffs and Whole *680 Foods those issues, despite receiving letters regarding those issues from the Ara-bella Group.
Whole Foods asserts that the exclusivity provision expired on March 9, 2000, pursuant to the terms set forth by the March 9, 1999 letter to the Arabella Group. However, the intention of the parties to extend the exclusivity provision in the August 2, 2000, letter by expressly stating that the purpose of the letter was to “reiterate our [Whole Foods’] intention to work solely with the Ogden Berger |9Group for the development of the historic Arabella [sic] Bus Barn,” raises a genuine issue of material fact. We also find that a genuine issue of material fact exists as to whether the Arabella Group, in reliance on Whole Foods’ commitment to pay an acceptable fee, contacted a representative of the RTA and told him that the Arabella Group withdrew its objection and expressed support for the Whole Foods store as part of a Bus Barn development.
Summary judgment is seldom appropriate for determinations based upon subjective facts, such as motive, intent, good faith, knowledge and malice. Gertler v. City of New Orleans, 03-2131 (La.App. 4 Cir. 9/1/04), 881 So.2d 792. A genuine issue is a triable issue. Smith v. Our Lady of the Lake Hosp., Inc., 93-2515 (La.7/5/94), 639 So.2d 730. A fact is “material” when its existence or nonexistence may be essential to the plaintiffs cause of action under the applicable theory of recovery. Id. 639 So.2d at 750, citing Penalber v. Blount, 550 So.2d 577, 583 (La.1989). The parties’ intention to extend the exclusivity provision in their contract is a factual determination, which requires inferences, and credibility determinations for the trier of fact and not a matter subject to summary judgment. The trier of fact is responsible for determining the credibility of witnesses, the intent of the parties, and the value of evidence substantiating contested positions by weighing all of the evidence presented by both sides at a trial on the merits.
The Arabella Group asserts that it was the intent of the parties that as long as the property was not sold or leased, the parties were exclusively bound to work solely with each other. After careful review of the record, we find that the RTA did not sell or lease the property to the Sarpy Group until November of 2001. Therefore, the Arabella Group asserts that the intent of the parties was for the exclusivity provision to remain in effect until November of 2001. Conversely, |indefendants assert that the RTA and the Sarpy Group perfected a Purchase Agreement in September of 2000, however, purchase agreements are not considered acts of sale. We find the matter inappropriate for summary judgment. The factual determinations as to whether the parties’ actions extending the exclusivity agreement or whether, as of October of 2000, the Arabella Group still had an opportunity to obtain the Bus Barn development, are the responsibility of the trier of fact.
DECREE
In light of the foregoing discussion, we find that the trial court erred in granting defendants’ Motions for Summary Judgment. Accordingly, we reverse the judgment of the trial court and remand the matter for further proceedings.
REVERSED AND REMANDED.
BELSOME, J., concurs in the result.